UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERENDIRA LUCATERO DE LOPEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>  Defendant.<br>_____/ | CASE NO. 1:10-cv-01300-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

   Plaintiff Erendira L. De Lopez, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record, this Court concludes that substantial evidence supported the Commissioner's denial of benefits.

///

///

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge.

I.  **Administrative Record**

   A.  **Procedural History**

On March 7, 2006, Plaintiff applied for disability benefits pursuant to Title II of the Social Security Act and for supplemental security income ("SSI"), alleging disability beginning March 17, 2006. Her claims were initially denied on October 11, 2006, and upon reconsideration, on April 20, 2007. On May 9, 2007, Plaintiff filed a timely request for a hearing. Plaintiff appeared and testified at a hearing on September 2, 2008. On October 29, 2008, Administrative Law Judge James P. Berry denied Plaintiff's application. The Appeals Council denied review on March 10, 2010. On July 20, 2010, Plaintiff filed a complaint seeking this Court's review.

   B.  **Factual Record**

While working as a housekeeper for Merry Maids in December 2000, Plaintiff (born January 18, 1955) fell and injured her hands, arms, shoulders, and back in an on-the-job accident. Thereafter, she underwent unsuccessful surgery on her dominant right hand. She could only write for five to ten minutes before experiencing pain. (The agency interviewer observed that Plaintiff had trouble sitting and winced when she used her hands to write.)

From 2001 to February 2006, Plaintiff worked as a hotel housekeeper in Yosemite, commuting by car from her home in Madera, California. She left her work when her pain and joint inflammation rendered her unable to clean sufficient rooms (twelve rooms per day) to keep her job. Moving heavy furniture and pushing the vacuum cleaner increased the pain and inflammation in her hands, arms, and back. Although she controlled her pain using Tylenol and rest, her body ached, and she slept poorly. Because of bladder reconstructive surgery, she urinated approximately every half hour.[2]

Plaintiff lived with her husband and mother. She drove herself to shop, to church and to pay bills. She shopped for about two hours once a week. Plaintiff testified that she could lift little more than a grocery bag or a gallon of milk. After preparing and eating her breakfast, her back pain became unbearable and she would lie down. She did small (ten pound) loads of laundry two

---

[2] No evidence in the record documented Plaintiff's having had bladder surgery.

2

or three times weekly.  She washed dishes although it exacerbated her back pain.  Because she frequently dropped and broke dishes, she used disposable dinnerware and utensils.  She continued to cook full meals but could no longer lift the pots and pans.  Sometimes she watched television but her medication often made her fall asleep.  Although she attended church three times weekly, she often left early because she could no longer bear to sit and stand. Because of her hand pain, she had difficulty with shoes and buttons.

At the time of the hearing, Plaintiff's medications included Prednisone, Plaquenil, Imodan, Roxine, and Cymbalta.  She could not afford to buy her medications and depended on her physicians to give her samples.[3]  When samples were not available, she took only Tylenol.  When available, prescription pain relievers relieved about 80 percent of her pain but made her dizzy. Cymbalta put her to sleep.

Plaintiff expressed frustration about her inability to do the things she liked to do.  She had always been independent and worked.  As a result, she suffered depression and anxiety.  She had become forgetful and had trouble concentrating.

Plaintiff completed the GED in Spanish.  She read and wrote only a little English.  Other sources, including her medical records, record that she is completely unable to communicate in English.

**Dr. Lewis.**  Treatment of Plaintiff's injuries following her accident in December 2000 was managed by industrial physicians provided through workers' compensation.  On January 3 and 5, 2001, Charles O. Lewis III, M.D., provided follow-up care for injuries described as cervical dorsal lumbar strain, left shoulder strain, and right and left wrist strain.  Her condition improved with physical therapy.

**Dr. Ahmed.**  At some point, Plaintiff began treatment with orthopedist Khalid Ahmed, M.D., in Pico Rivera, California.  On October 21, 2001, Ahmed performed surgery on Plaintiff's right wrist, discovering that Plaintiff had not only carpal tunnel syndrome, but also flexor

---

[3] The record does not disclose how Plaintiff financed her frequent medical appointments.  Plaintiff's husband was employed full time.  The evidence does not evidence coverage by MediCal.

3

tenosynivitis.[4] In May 2001, Ahmed referred Plaintiff to neurologist Ronald Cyrulnik, M.D., who conducted tests and determined that Plaintiff had a nerve root compromise at C-7 bilaterally. In May, Ahmed also referred Plaintiff for magnetic resonance imaging of her spine. Imaging of Plaintiff's lumbar revealed straightening of the lumbar lordotic curve, disc dehydration and a mild posterior disc bulge at L5-S1, and a small annular fissure in the central third of the disc bulge. Imaging of her cervical spine revealed a five degree dextrororoscoliosis centered at C7 and dehydration and a small posterior disc bulge at C5-6.

In a workers' compensation report dated June 21, 2002, Ahmed noted that Plaintiff had carpal tunnel syndrome in both hands, with the left hand more seriously affected that the right hand, which had been surgically released. He also noted that Plaintiff's herniated cervical and lumbar discs had been treated with epidural facet injections with good results.

On June 27, 2002, Cyrulnik repeated upper extremity testing, which indicated compromised function of the median nerve in Plaintiff's left wrist (carpal tunnel syndrome) and compromised function of the right ulnar nerve (cubital tunnel syndrome).

**Dr. Samrao.** Internist Satwant Samrao, M.D., has been Plaintiff's primary care physical since September 12, 2005. Plaintiff's initial complaints included all over aches and pains, morning joint stiffness, menopausal symptoms, sadness, fatigue, dyspepsia, and headaches. She complained to Samrao that her prior doctors were not helping her. Samrao diagnosed, among other things, arthralgias and myalgias of undetermined etiology and depression. Plaintiff continued to see Samrao for regular care, including such issues as bronchitis and viral gastroenteritis.

On February 10, 2006, Plaintiff complained of aches and pains with fever and chills, and told Samrao that while in Mexico, doctors had diagnosed pneumonia and performed many tests

---

[4] "Flexor tenosynovitis (FT) is a pathophysiologic state causing disruption of normal flexor tendon function in the hand. A variety of etiologies are responsible for this process. Most acute cases of FT are the result of infection. However, FT can also be secondary to acute or chronic inflammation as a result of diabetes, overuse, or arthritis." www.emedicine.medscape.com/article/1239040-overview (August 2, 2011). FT causes swelling, tenderness along the tendon sheath, and pain with passive extension of the finger. *Id*. "The process has the ability to rapidly destroy a finger's functional capacity and is considered an orthopedic emergency." *Id*.

that she did not understand.[5] Samrao considered the increased body pains to be associated with Plaintiff's illness, which he suspected could be coccidiodomyosis (valley fever). Plaintiff was still ill when she returned on February 14, 2006. Testing revealed that her problem was not coccidiodomyosis, but a CT scan revealed an abnormal chest mass. Samrao order further testing for coccidiodomyosis and hepatitis. When Plaintiff returned on March 2, 2006, she was feeling better except for right arm and upper back pain, all further testing was negative.

On March 24, 2006, Plaintiff returned to Samrao, reporting that she had pain in her right shoulder and could not work. She was unable to sleep. She had applied for social security disability. Samrao granted Plaintiff three more months off of work and noted, "[S]he [h]as requested to continue her process for social security disability, more than likely she will be denied." AR 252.

Samrao certified to her employer that Plaintiff's persistent pain prevented from working and that he was treating Plaintiff for subacromial bursitis and depression. Samrao noted that Plaintiff had poor pain tolerance. Samrao continued to provide periodic medical (disability) excuses for work throughout his treatment of Plaintiff.

On April 24, 2006, Plaintiff told Samrao that she had pain throughout her body, her bones hurt, and she had low back pain and pain in both legs. She requested anti-inflammatory medication. Samrao diagnosed fibromyalgia, injected Plaintiff's right median nerve with Kenalog and Marcaine to provide pain relief, and referred her for lumbosacral spine x-rays. The x-rays revealed a "normal lumbosacral spine." AR 309. Plaintiff returned on May 5, 2006, complaining that her aches and pains continued and advising Samrao that she needed to have her "forms filled." Samrao began slowly increasing Plaintiff's antidepressant, suspecting that her pains were due to depression.

Because of Plaintiff's complaints of bilateral neck pain radiating toward both hands, Samrao referred Plaintiff to Perminder Batia, M.D., of the Neuro-Pain Medical Center, who

///

---

[5] The record includes references to many doctors for whom Plaintiff did not present treatment notes or other records.

5

conducted EMG studies of Plaintiff on June 7, 2006. Batia reported that the results of the studies were normal.

On July 10, 2006, Plaintiff complained to Samrao that she had seen Batia, who had prescribed Naproxen, which made her bloat. Plaintiff further complained that she did not want to take Vicodin or Tylenol with Codeine, which did nothing but make her sleepy. Nor did she want to take morphine, since she hurt all the time. Samrao diagnosed subacute lupus erythematosus and brain syndrome.

Samrao referred Plaintiff to rheumatologist Yasmeen Khalid, M.D. On July 31, 2006, Plaintiff complained to Samrao that the medications were expensive. Samrao's notes are not clear but suggest that Plaintiff may not have filled the prescription.

According to Samrao's notes, at the August 31, 2006 appointment, Plaintiff said:

> I am here for a recheck. I want my papers filled up. I went to a doctor in Fresno. He told me I have fibromyalgia then I need to lose weight. I need to do exercise, same thing a Hispanic doctor told me. I take Neurontin it is helping me. The medication gave me last time they helped me.

AR 347.

Samrao diagnosed chronic pain syndrome, chronic myalgia and arthralgias, and hypothyroidism.[6]

Samrao's notes again quote Plaintiff's comments at the October 31, 2006 appointment:

> I am having aches and pains. My joints hurt. My muscles hurt. I have some medications from Mexico. I do not know what those are. No loss of weight or loss of appetite. I applied for some social security, they denied me.

AR 344.

On November 16, 2006, Plaintiff told Samrao:

> I am here for lab results. It is getting cold. I am hurting more, my muscles hurt more, my joints hurt more and I am moving to Mexico for two or three months. I

///

---

[6] Among the symptoms of hypothyroidism are fatigue; sluggishness; muscle aches, tenderness, and stiffness; pain, stiffness, and swelling of joints; muscle weakness; depression; and sensitivity to cold temperatures. www.mayoclinic.com/health/hypothyroidism/DS00353/DSECTION=symptoms (August 3, 2011). Hypothyroidism is diagnosed by measuring a patient's level of thyroid stimulating hormone (TSH), which increases as the patient's thyroid level drops. The normal adult range of TSH is 0.34 to 5.60 uIU/ml. On November 1, 2006, Plaintiff's TSH level was 16.10 uIU/ml. AR 306.

would like my disability extended.  I will come back at the end of February.  I have an appointment with the rheumatologist in May 2007.

AR 340.

Samrao noted that Plaintiff's general physical condition was unchanged.

On February 15, 2007, Plaintiff told Samrao:

I need medication refills.  I have aches and pains all over the body.  I hurt.  My joints are stiff in the morning.  I went to Mexico.  I am taking all these medications, sometimes in the night I have to take three or four pills for the pain.  I do not want to take morphine.

Samrao diagnosed chronic pain syndrome, hypothyroidism, and fibromyalgia.

On June 22, 2007, Plaintiff complained of leg and arm pain, reporting that she hurt everywhere.  Although she reported that the Cymbalta and Toradol helped, she had run out of all medications.  Samrao emphasized the need for Plaintiff to consistently take her thyroid medications.

On October 23, 2007, Plaintiff complained of frequent urination.  Samrao diagnosed a urinary tract infection and prescribed medication.  Plaintiff also requested Lyrica samples.

At an appointment on December 27, 2007, Plaintiff complained of aches and pains and painful joints.  Although her medications were helping her, they made her sleepy.  Her face and arms were swollen and rashy.  Samrao again pondered whether Plaintiff might have lupus.

On April 7, 2008, Plaintiff saw Samrao for a check-up, complaining of weight gain and swollen feet.  In addition to her thyroid medications, Samrao prescribed an appetite suppressant.

On May 7, 2008, Plaintiff saw Samrao for medication refills.  Plaintiff again saw Samrao on August 13, 2008, requesting that he complete additional forms for her social security disability application and provide Lyrica samples.

On August 18, 2008, Samrao completed a questionnaire prepared by Plaintiff's attorney.  He opined that Plaintiff had been disabled as described in the questionnaire since February 2006.  According to Samrao, Plaintiff's primary impairments were fibromyalgia and chronic pain syndrome, based on the presence of tender trigger points.

Samrao opined that Plaintiff could not work at all due to constant pain.  She could perform no lifting.  She was able to sit for no more than 15 minutes and stand or walk for no more than 15

minutes.  She could not sit, stand or walk during an eight-hour workday.  She must lie down and elevate her legs for five minutes in an eight-hour workday.

**Dr. Klein.**  On July 12, 2006, internist Adi Klein examined Plaintiff as an agency consultant.  Plaintiff complained of "total body pain," telling Klein that she had recently been diagnosed with lupus.  Klein noted that Plaintiff appeared depressed but was alert and well-oriented.  Her back was not tender to touch, had no muscle spasm, and had even muscle tone.  Straight leg raising test was negative.[7]  The range of motion of Plaintiff's back was within normal limits.

Plaintiffs left and right wrists, shoulders, and elbows were not swollen and had normal range of motion.  Finger approximation was intact and range of motion was normal.  Hips, knees, ankles, and feet displayed no swelling or other abnormalities, and demonstrated normal range of motion.  Although Plaintiff's neurological examination was generally normal, she displayed 14 of 18 fibromyalgia tender points.

Klein diagnosed fibromyalgia, morbid obesity, and depression.  He opined:

> At this time, due to fibromyalgia and obesity, the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  She can walk and stand six hours in an weight-hour workday, with appropriate breaks.  She can sit six hours in an eight-hour workday.  There are no postural, manipulative, visual, communicative or environmental limitations.  No provision for height, age or gender has been made.

AR 276.

**Agency psychiatric consultation.**  Plaintiff told psychiatrist Ekram Michiel, M.D., retained as the agency psychiatric consultant, that she started to feel depressed when she had pneumonia and her doctor told that she did not have pneumonia but she was depressed.  Michiel's reports of testing set forth nothing remarkable.  Nonetheless, Michiel diagnosed Plaintiff:

Axis I:        Dysthymic disorder.

Axis II:       Deferred.

---

[7] The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc.  The test is positive if the patient experiences pain down the back of the leg when the leg is raised.  *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No. 1:09-cv-1257-SKO).

8

Axis III:    By history, postmenopausal syndrome, low back pain, shoulder pain.

Axis IV:    Health condition.

Axis V:     GAF 65-70.

AR 280.[8]

In summary, Michiel opined:

> I believe the claimant is capable of handling her own funds, capable of maintaining attention and concentration, able to carry out at least simple job instructions, not extensive varieties of technical or complex job instructions, capable of relating appropriately to coworkers, supervisors, and the public. Her dysthymic symptoms are not going to interfere with her performing simple repetitive tasks, however, might impair her ability to deal with the usual stress encountered in competitive work place, dealing with complex technical job instructions.

AR 280-281.

**Residual functional capacity.** T.P. Nguyen, M.D., prepared the physical residual functional capacity assessment on behalf of the agency. Nguyen opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; could stand or walk six hours in an eight-hour day; could sit about six hours in an eight-hour day; had unlimited ability to push and pull; and demonstrated no postural, manipulative, visual, or environmental limitations.

**Psychiatric review technique.** On September 26, 2006, K.J. Loomis, M.D., prepared the psychiatric review technique for the agency. Loomis opined that Plaintiff demonstrated affective disorders causing mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. She was moderately limited in her ability to understand and

///

---

[8] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id.* at 34. The first description in the range indicates symptom severity; the second, level of functioning. *Id.* at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. *Id.* at 33.
 GAF 65-70 is the top half of the range GAF 61-70, which indicates ""[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

remember detailed instructions, to carry out detailed instructions, and to interact appropriately with the general public.

On April 16, 2007, S. Bortner prepared a second psychiatric review technique, finding that Plaintiff had an affective disorder (dysthymia) that was not severe. Bortner opined that Plaintiff had no functional limitations other than mild difficulties in maintaining social functioning.

**Dr. Khalid.** Rheumatologist Yasmeen Khalid, M.D., first examined Plaintiff on January 1, 2008. Khalid described Plaintiff's chief complaint as diffuse musculoskeletal complaints, particularly in her back and extremities, which began worsening after April 2007. Plaintiff complained of morning stiffness, increased pain, extreme fatigue, and swelling of her joints, particularly her wrists and feet.

Khalid concurred with Samrao's diagnosis of fibromyalgia and proposed a trial of nonsteroidal anti-inflammatory drugs with the objective of reducing joint inflammation. Khalid questioned whether Plaintiff might be developing an inflammatory arthritis, such as rheumatoid arthritis.

By January 24, 2008, Plaintiff was feeling much better and had less pain. Prednisone had helped Plaintiff a lot. Khalid prescribed various medications for both fibromyalgia and rheumatoid arthritis.

On February 27, 2008, Plaintiff reported improvement except that she felt swollen and complained of fatigue. Khalid observed that Plaintiff's joints were less inflamed and her tender points were reduced. Khalid continued prescriptions for rheumatoid arthritis and fybromyalgia, and suggested that the fatigue might be attributable to Plaintiff's hypothyroidism.

On April 30, 2008, Plaintiff continued to report improvement but complain of fatigue. Joint inflammation and tender points had increased.

On June 23, 2008, Plaintiff complained of left leg and hip pain and was limping. Swelling, inflammation, and soft tissue tender points had increased. Plaintiff was not taking some medications since she could not afford them. Accordingly, Khalid provided sample medications on June 23, July 14, and August 4, 2008.

///

Khalid completed a questionnaire for Plaintiff's attorney on August 18, 2008, reporting Plaintiff's diagnosis as rheumatoid arthritis. She opined that Plaintiff had been disabled as described in the questionnaire since April 2008. According to Khalid, Plaintiff's primary impairments were joint pain and extreme fatigue, based on joint inflammation and the presence of tender points on palpation.

Khalid agreed with a leading question describing that Plaintiff was limited to sedentary work (i.e., lifting no more than ten pounds, sitting for six hours in and eight-hour day, and standing or walking for two hours in an eight-hour day). The doctor also agreed with a leading question that Plaintiff was not able to lift twenty pounds occasionally and ten pounds frequently. In response to an open-ended question, however, Khalid opined that Plaintiff could sit for six hours in an eight-hour workday, stand for four hours in an eight-hour workday, and walk for one to two hours in an eight-hour workday. She might need to elevate her legs "for only ten to fifteen minutes" in an eight-hour workday. Khalid added that Plaintiff should avoid lifting heavy weights, multiple repetitive joint movements, and temperature extremes.

**Psychological evaluation.** At the request of Plaintiff's attorney, psychological trainee Esther Orellana, M.A., under the supervision of Michael Zimmerman, Ph.D., provided a psychological evaluation of Plaintiff. Orellana provided a detailed summary of Plaintiff's mental health history, and administered the Wechsler Adult Intelligence Scale-Revised Spanish, Test of Nonverbal Intelligence III, Test of Memory, and Minnesota Multiphasic Personality Inventory-2 Spanish. Although Plaintiff was anxious, Orellana concluded that Plaintiff did not have a mental disability.

**Vocational expert testimony.** Thomas Dachelet testified as a vocational expert. He testified that although references described housekeeping as light, unskilled work, as Plaintiff's description indicated medium physical demand. Pistachio sorting, a job Plaintiff last performed in 1992 and 1994, was light and unskilled; her previous vineyard work was medium and unskilled.

For the first hypothetical question, the ALJ directed Dachelet to assume a 53-year-old individual with a GED and past work experience as a housekeeper, pistachio sorter and vineyard worker, who has a combination of severe impairments and retains the ability to lift twenty pounds

11

occasionally and ten pounds frequently; who can stand, sit, and walk six hours in an eight-hour workday; who retains the ability to perform simple repetitive tasks and maintain attention, concentration, persistence, and pace; who retains the ability to relate and interact with others but must have only occasional public contact; who can adapt to usual changes in work settings; and who can adhere to safety rules. Dachelet opined that such a person could perform housekeeping and pistachio sorting as described in the DOT (light) but not as performed by Plaintiff (medium).

For the second hypothetical question, the ALJ directed Dachelet to assume an individual with the same serious impairments; who is able to lift and carry three pounds maximum; sit one hour total; stand approximately one and on-half hours total; walk less than one block; needs to use the restroom every half hour; use her hands five to ten minutes at a time; take five or six rest breaks a day; and has difficulty gripping or grabbing with either hand. Dachelet opined that such a person could not perform Plaintiff's previous jobs and could not perform any job that exists in the national economy.

Plaintiff's attorney then asked Dachelet if the individual could perform Plaintiff's prior work if she had moderate difficulty in maintaining social functioning and moderate difficulty in maintaining concentration, persistence, or pace. Dachelet opined that moderate persistence and pace would eliminate all available jobs.

Plaintiff's attorney then asked Dachelet if a person with moderate limitation in her ability to understand, remember and carry out detailed instructions and moderate ability to interact appropriately with the public could perform Plaintiff's prior jobs. Dachelet opined that such a person could perform Plaintiff's prior jobs without a weight restriction but could not perform them if she were limited to lifting and carrying ten pounds frequently.

Dachelet also opined that a person who need to use the restroom every half hour would not be employable.

## II.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 17, 2006. She had multiple severe impairments: fibromyalgia, rheumatoid arthritis, hypothyroidism, and depressive disorder. Her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the residual functional ability to lift and carry 20 pounds occasionally and 10 pounds frequently; to sit, stand, and walk six hours in an eight-hour work day; could perform simple repetitive tasks; could maintain attention, concentration, persistence, and pace; could relate to and interact with others, but must have only occasional contact with the general public; could adapt to changes in work settings; and could adhere to safety rules. She was capable of performing her past work as a

///

housekeeper or sorter, as those jobs were described in the DOT.  The ALJ concluded that Plaintiff was not disabled.

### III.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.  When it did so, the Court discovered a record more extensive than the documents on which the ALJ had relied, which portrayed the claimant very differently than the ALJ did.  When considered in light of applicable law, the Court concludes that the ALJ erred in denying Plaintiff benefits.

### IV.   Discussion: Did the ALJ err in failing to consider Dr. Khalid's opinion?

Plaintiff's sole claim on appeal is that the ALJ impermissibly dismissed Khalid's opinion as her treating physician.  The Commissioner responds that Plaintiff waived the issue by failing to submit the opinion before the administrative hearing and closing of the administrative record.

///

///

**A.     Plaintiff's untimely submission of additional evidence did not conform to regulations.**

Because Plaintiff failed to follow the regulatory procedure for submitting late evidence, the ALJ did not err in failing to consider Khalid's opinion in the hearing decision.

The regulations provide that all available evidence must be submitted with a claimant's hearing request. 20 C.F.R. § 405.331(a). Additional evidence must be submitted no later than five business days before the hearing date. *Id.* If the claimant misses the deadline and wishes to submit additional evidence at the hearing or within five business days before the hearing, the ALJ will accept the evidence upon a showing that (1) the Commissioner's action misled the claimant; (2) the claimant had physical, mental, educational, or linguistic limitations that prevented the evidence's earlier submission; or (3) the claimant was prevented from submitting the evidence by some other unusual, unexpected, or unavoidable circumstance. 20 C.F.R. § 405.331(b).

Although Dr. Khalid's opinion was purportedly prepared before the administrative hearing on September 2, 2008, Plaintiff did not seek to submit it at or before the hearing. Instead, in response to the ALJ's query regarding outstanding evidence, Plaintiff's attorney declared that he had no further evidence to submit. Accordingly, the ALJ closed the record at the hearing and admitted Exhibits 1-A through 20-F.

If a claimant fails to submit evidence at or before the hearing, the ALJ will accept the evidence after the hearing and before the issuance of the hearing decision if the claimant first shows a reasonable possibility that the evidence, alone or in combination with other evidence in the record, would affect the outcome of the claim, and then shows that (1) the Commissioner's action misled the claimant; (2) the claimant had physical, mental, educational, or linguistic limitations that prevented the evidence's earlier submission; or (3) the claimant was prevented from submitting the evidence by some other unusual, unexpected, or unavoidable circumstance. 20 C.F.R. § 405.331(c). Plaintiff did not submit Khalid's opinion until October 22, 2008, simply forwarding it to the ALJ without making the showing required by the regulation. AR 396-398.

Nonetheless, the report was thereafter included in the agency record as part of Exhibit 21F. But the ALJ's decision, dated October 29, 2008, did not comment on either Khalid's opinion.

Because Plaintiff herself failed to follow appropriate procedures for submitting evidence following the hearing, the ALJ did not err in failing to consider it in the hearing decision.

> **B.    The Appeals Council properly concluded that the additional untimely exhibits, including Khalid's opinion, did not change the outcome of the ALJ's decision.**

On November 11, 2008, Plaintiff appealed the ALJ's decision to the Appeals Council, stating as grounds only that "The decisions being issued are generally failing to comply with the mandates under case law and SSR 96-7p, and this is no exception." AR 12. Plaintiff's attorney added, "I also may have additional records to submit." AR 12. Plaintiff's vague grounds for appeal did not mention Khalid's opinion or address further the circumstances of its untimely submission.

The Appeals Council incorporated additional evidence, including Exhibit 21F. AR 10. Nonetheless, on March 10, 2010, it denied review of the ALJ's opinion, stating that although it considered the additional evidence, it concluded that the information did not provide a basis for changing the hearing determination. AR 7-9. This Court agrees that, even if Khalid is classified as a treating physician, her opinion was insufficient to provide a basis for changing the hearing decision.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). Although the record also includes Khalid's treatment notes, the relevant opinion in this appeal is the attorney-prepared questionnaire in which Khalid addressed Plaintiff's ability to perform work. The regulations direct the Court to evaluate the opinion by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

1  claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant
2  (nonexamining physicians)." *Lester*, 81 F.3d at 830.  That Khalid is a treating physician is not
3  disputed.  A treating physician's opinion is generally entitled to more weight than the opinion of a
4  doctor who examined but did not treat the claimant, and an examining physician's opinion is
5  generally entitled to more weight than that of a non-examining physician.  *Id.*

6  The Social Security Administration favors the opinion of a treating physician over that of
7  nontreating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631(9th Cir. 2007).
8  A treating physician is employed to cure and has a greater opportunity to know and observe the
9  patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating
10 physician's opinion is not conclusive as to either a physical condition or the ultimate issue of
11 disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

12 As a rheumatologist, Khalid treated Plaintiff in conjunction with her primary care
13 physician Samrao.  Khalid had only treated Plaintiff for about eight months when she completed
14 the questionnaire provided by Plaintiff's attorneys.  In that time period, Khalid saw Plaintiff
15 monthly, the last three times to do little more than provide Plaintiff with sample supplies of her
16 prescriptions after Plaintiff told Khalid that she could not afford to purchase them.

17 The Commissioner reasonably questions Plaintiff's decision to consult with Khalid only
18 after she had repeatedly been denied disability benefits and had requested an administrative
19 hearing, even though Samrao had referred Plaintiff to Khalid eighteen months earlier.  When a
20 claimant secures the services of a new physician because he or she has failed to succeed on a
21 disability claim, the new physician's opinion is less persuasive since it was obtained only after
22 evidence presented earlier has not prevailed.  *Weetman v. Sullivan*, 877 F.2d 20, 23 (9th Cir. 1989).
23 In such a case, he Court may reasonably assume that the unsuccessful claimant has sought out a
24 new expert witness who will present an opinion that will better support the disability claim.  *Key*
25 *v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985).

26 With consistent use of her prescriptions, Plaintiff's condition improved. When Plaintiff
27 did not take her medications, her condition worsened.  Khalid's treatment notes supported the
28 ALJ's finding that Khalid provided conservative treatment composed of medication and monthly

17

follow-up appointments and that this conservative treatment greatly relieved Plaintiff's symptoms. Khalid's primary contribution to Plaintiff's health care was to confirm Samrao's suspicion that Plaintiff had rheumatoid arthritis (joint pin and inflammation) as well as fibromyalgia (soft tissue pain).

In contrast to the very limited capacity set forth by Plaintiff's attorneys and to which Khalid agreed, the notes documented that in the eight months in which she was treated by Khalid, Plaintiff felt better, had less pain, and showed objective improvement. An ALJ is not bound by a physician's opinion on a claimant's limitations, when that opinion is inconsistent with is or her treatment notes. *Weetman*, 877 F.2d at 23.

Not only were Khalid's responses to the questionnaire inconsistent Khalid's own treatment notes, the answers to the questionnaire were internally inconsistent. Although Khalid indicated agreement with leading questions that outlined Plaintiff' abilities based on sedentary residual functional capacity, later in the questionnaire Khalid opined that Plaintiff could sit six hours in an eight-hour workday, stand four hours in an eight-hour workday, and walk for two hours in an eight-hour day. The questionnaire did not provide an open-ended question requesting Khalid's opinion regarding Plaintiff's ability to lift and carry.

Khalid's opinions were not only internally contradictory, they were inconsistent with Plaintiff's own testimony that she was doing reasonably well at the time of the hearing. She was able to drive herself to shop, to attend church and to pay bills. She shopped for about two hours once a week. Plaintiff could lift a grocery bag or a gallon of milk. She was able to do ten-pound loads of laundry two or three times weekly. She washed dishes. Plaintiff testified that she could sweep but her mother would not let her.

Finally, in determining whether Khalid's opinion would have altered the outcome of the decision, the Court cannot ignore the balance of the ALJ's reasoning and conclusions. *See Jones*, 760 F.2d at 995 (directing the reviewing court to consider the record as a whole). The hearing decision explicitly discounted Plaintiff's subjective complains, noting the obvious contradiction between the severity of Plaintiff's claimed pain and disability, and her own testimony regarding her daily activities and physical abilities.

The Court agrees with the ALJ's conclusion that Plaintiff lacked credibility. In addition, the Court observes that despite Plaintiff's claims of unbearable pain, her medical records, particularly those of Samrao, repeatedly note Plaintiff's unwillingness to consider morphine or other strong prescription pain relievers since the sedating effect of such strong pain killers would interfere with her life activities. Plaintiff did not act on Samrao's July 2006 referral to Khalid until January 2008. She was selectively noncompliant with medications, requiring Samrao to instruct her of the importance of consistently taking her thyroid medication. Plaintiff's attitude is not consistent with her testimony of *unbearable* pain. When the record is considered as a whole, substantial evidence supported the ALJ's decision. Khalid's opinion would not have changed the outcome.

### III.  Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Dr. Khalid's opinion, which Plaintiff untimely submitted, would not have changed the outcome of the decision.

Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

**Dated:   August 5, 2011**                               **/s/ Sandra M. Snyder**
                                                  UNITED STATES MAGISTRATE JUDGE